UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

CHARMANE ECHOLS

        Plaintiff,

v.                                       Case No. 1:10-CV-997

KALAMAZOO PUBLIC SCHOOLS,              HON. GORDON J. QUIST

        Defendant.
_____/

## OPINION GRANTING SUMMARY JUDGMENT

Plaintiff, Charmane Echols, filed an Amended Complaint alleging violations of the Americans with Disability Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Michigan Persons with Disabilities Civil Rights Act (MPDCRA), M.C.L.A. § 37.1101 *et seq.*, stemming from her employment with Defendant, Kalamazoo Public Schools (KPS). She alleges that in 2008 and 2009 KPS declined to promote her to four internal positions because of a perceived disability stemming from an automobile accident in 1988. KPS filed a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. (Dkt. #37.) Echols responded to the motion (Dkt. #47), to which KPS replied. (Dkt. #53.) The Court heard oral argument on the motion. For the reasons set forth below, this Court will grant summary judgment because Echols does not have evidence of direct discrimination and she does not have indirect evidence of discrimination since: A) she has not rebutted KPS's evidence that no one perceived her to have a disability at the time of interviewing; and B) no reasonable jury could find that the reasons KPS articulated for not hiring her are pretext for discrimination.

### BACKGROUND

Since 1978, Echols has been employed at KPS in several positions, including an Elementary Teacher, a Principal at Northglade Elementary School ("Northglade"), and multiple Assistant

Principal positions. Echols was an Assistant Principal at Woods Lake Elementary ("Woods Lake") until KPS eliminated all elementary school Assistant Principal positions. Echols is currently a Leadership Coach.

Echols obtained a Master's Degree from Western Michigan University in "Reading Instruction."[1]

In 1988, Echols was in a car accident. She suffered a "closed head injury," which caused her to be absent for the remainder of the 1988-89 school year. She returned to work in January 1989. Echols had residual effects from the closed head injury that caused her to take medical leave in 1993.

In August 1997, Echols received a promotion to be the Principal at Northglade. Soon thereafter, Yvonne Payton, Echols's supervisor, received complaints from parents and staff regarding Echols's performance as principal as well as complaints regarding her leadership abilities. On November 5, 1998, Payton sent a letter to Echols explaining that parents believed Echols was "not attentive and/or sensitive to their needs" when the parents voiced concerns over their childrens' educations. At a later date, Payton wrote another letter to Echols detailing "great difficulties" at Northglade under Echols's leadership. In particular, Payton thought that Echols disregarded her suggestions for improvement and noted that student test scores had significantly dropped from the previous year. On February 19, 1999, Echols stepped down and took a different position at another elementary school within KPS. In a very vague assertion, Echols alleges that someone from her union told her that she was asked to change positions because of the closed head injury. Echols does not, however, argue that her stepping down from principal to assistant principal was based on discrimination.

---

[1] Echols, in her brief, states that she "obtained her Doctorate" from Walden University, (Pl.'s Br. at 1), but she unquestionably did not have a doctorate during the events in question. Echols admitted in her deposition that she has not received her doctorate. (Echols Dep. II at 7.) She has finished the "coursework," but has not completed her dissertation.

Ever since Echols stepped down from her position at Northglade over 12 years ago, she has been an assistant principal at three different schools in KPS. In 2008 and 2009, nearly 9 years after stepping down, Echols decided to apply for the positions in question.

**KPS Interview Procedures**

After applicants apply for open positions, Mary Weber, the Assistant Superintendent of Human Resources, reviews the applicants' credentials to determine who is qualified for the position. Qualified persons are scheduled to be interviewed. An applicant does not receive an interview unless they meet the minimum qualifications.

KPS has a predetermined format for conducting interviews for open positions and for each position for which Echols applied the procedures were followed. Candidates are selected to interview after an online posting lists the position description along with the required and desired qualifications. Candidates submit a resume; fill out an online application, and submit references.

The interview process consists of several rounds, but the process can have more or fewer rounds depending on the competitiveness of the applicants. The initial interviews are "panel interviews"–interviews conducted by panels of KPS administrators, community members, and parents. Each panelist asks a candidate predetermined questions in sequential order. The panelists are asked to limit follow-up questions to an applicant's "ability to do [the] job" in question. Individually, panelists take notes during the interviews. Each candidate is allotted a predetermined amount of time, usually 30 minutes, to answer questions in front of the panel. All candidates for a position are scheduled in consecutive time slots, typically with no break between each candidate.

At the end of all of the interviews, the panel members are given the opportunity for discussion "if [the] team wishes to discuss." The panel members from Echols's interviews unanimously said that there was no discussion. At the end, each panel member, individually, fills out a feedback form and puts it, along with the notes, in a plain folder. Each panel member

individually ranks the candidates.  A "facilitator" collects the responses.  Weber facilitated each of the interviews in question.

For all administrative positions and each position for which Echols applied, the last round of interviews is conducted by the Superintendent, Dr. Michael Rice, along with the open position's supervisor.[2]  Dr. Rice does not participate in the panel interviews.  Before conducting the final interviews, Dr. Rice receives the feedback forms from the panel interviews; the identity of each panel evaluator remains anonymous.   Ultimately, Dr. Rice makes the final hiring decision.

**Echols applies to several positions and is not hired for any**

In 2008 and 2009, Echols applied for four positions within KPS, each of which would be considered a promotion.  She was not selected for any position.  Echols alleges that she was denied the positions based upon KPS's perception of her having a disability resulting from the closed head injury that she suffered in 1988.

**1.       Principal - Woods Lake Elementary School**

This was an "open" position,[3] which turned out to be for Woods Lake.  In May 2008, Echols had a panel interview for the position.  The panel of eight included Mary Weber, Yvonne Davis, Patricia Coles-Chalmers and Dee Callander.  Ultimately, KPS awarded Mitch Hawkins the position. Echols questions the decision to select Mitch Hawkins because she had more administrative experience than Hawkins.

**2.       Coordinator of Early Childhood Education**

In March 2009, Echols applied for the Coordinator of Early Childhood Education position, but did not receive an interview.  A "minimum qualification" for the position was a Master's Degree

---

[2] Or the supervisor's supervisor.

[3] The "open" position meant that KPS needed another principal, but Dr. Rice had not decided the school at which each principal would be working.

4

in "Early Childhood Education" or "Child Development." Echols does not have a Master's Degree in either of these fields, and thus did not meet the minimum qualifications for the position. Echols thinks that because she has more administrative experience than the other candidates that were selected for an interview, the decision must have been based on discrimination.

KPS awarded Kellye Wood the position. The panel members unanimously recommended Wood for the position. Among her qualifications, Wood had the requisite degree and administrative experience.

### 3.    Director of Elementary Education

In May 2009, Echols had a panel interview for the position of Director of Elementary Education. The panel of six included Mary Weber and Patricia Coles-Chalmers. Ultimately, KPS awarded Dr. Zaheera Shakir-Khan the position.

Ms. Coles-Chalmers said that Echols's interview answers often seemed rehearsed or memorized, as if she had specific answers to questions that she thought would be asked during the interview. (Coles-Chalmers Dep. at 8-9.) Dr. Terina Harvey, another panel interviewer, chose Dr. Shakir-Khan as her top candidate and said that she looked for candidates who gave the best answers during the interview. (Harvey Dep. at 17.)

### 4.    Principal - Prairie Ridge Elementary School

On September 9, 2009, Echols had a panel interview for the Principal position at Prairie Ridge. The panel consisted of Mary Weber, Patricia Coles-Chalmers, Cindy Green, and Dr. Zaheera Shakir-Khan. Ultimately, KPS awarded Karen Spencer the position.

Dr. Shakir-Khan recalls Echols's answers as "disjointed" and that she "did not give direct responses to the questions asked." (Khan Dep. at 8.) Dr. Shakir-Khan said that she chose Spencer as her top candidate because "[h]er responses to the questions were the most comprehensive." (*Id.* at 9.) Cindy Green chose Spencer because she gave "in-depth answers for a lot of core areas like

5

reading and math." (Green Dep. at 7.) Echols said that she should have been selected for the position over Spencer because she had more administrative experience than Spencer.

According to Echols, during the interview, Weber asked Echols if she was referring to "notes" while answering questions. Echols testified that Weber's perception was that Echols should not have been able to answer the questions so well when Echols still suffered effects from a closed head injury. Echols did not say how she allegedly knew what Weber thought.

Echols went on to say that "[i]t is undisputed that members of the interview panels were aware that [Echols] had suffered a closed head injury including Patricia Coles-Chalmers and Cindy Green." Echols says that these individuals "definitely knew" because they were "around when the accident occurred." (Echols Dep. at 155.) Once again, Echols could not point to any facts that allowed her to draw this conclusion besides the fact that they were employed by KPS at the time it occurred. (*Id.* at 156.) Coles-Chalmers testified that she knew Echols was in an accident and suffered an injury, but she did not know that Echols had any symptoms related to it. (Coles-Chalmers Dep. at 4-5.) There is no evidence Cindy Green knew of the accident or injury. In any event, simply because someone knows that a person suffered an accident does not mean that this knowledge equates to knowing about a closed head injury.

**Post Interviews Feedback with Weber**

Echols sought out the advice of the Director of Elementary Education, Dr. Shakir-Khan, about why she had not been selected for any of the positions for which she interviewed. Per protocol, Dr. Shakir-Khan referred her to the Assistant Superintendent of Human Resources, Mary Weber. Besides being the proper person to give such feedback, Weber had been on every interview panel for which Echols interviewed and had acted as the "lead facilitator" and "timekeeper." Thereafter, Weber had a meeting with Echols to discuss ways for Echols to improve her chances of

6

receiving positions for which she interviewed. Echols and Weber have drastically different versions of the meeting that occurred.

Echols said that, after an initial greeting, Weber said "there's a lot of talk, I heard you had a closed head injury." (Echols Dep at 169.) Echols said that after she inquired into the relevance of it, Weber said "with parents, we can't have you having, you know, fragmented sentences, your connections are not there." (*Id.*) Then, Weber pulled out Echols's medical file. (*Id.*) Echols did not know that she had a medical file.[4] (*Id.*) Echols alleges that Weber said that Echols's medical file was incomplete, and that she needed to have a "neuro psych exam" to update her file and obtain a release to return to work (*Id.* at 169-70.) According to Echols, Weber made clear that Echols's closed head injury impacted her chances of moving beyond the first round of interviews. (*Id.* at 173.) Echols testified that "[s]he stated outright that I had a closed head injury and because of the closed head injury, my interactions with parents would not be favorable, and no, we can't have that." (*Id.*)

Weber said that she gave Echols feedback which was difficult for Echols to hear. Weber told Echols that her interview answers were fragmented and unclear. (Weber Dep. at 34-35.) Weber also thought that Echols should talk with her union to discuss the reasons why she had an unsuccessful tenure as the Principal at Northglade. Weber said that Echols began to cry. According to Weber, in an attempt to think of anything else that she could do to help Echols, Weber asked Echols if she knew what was in her medical file. Weber said that she left the room and retrieved the medical file. Weber said that she went through the medical file with Echols. Weber testified that it was the first time that she had ever seen or went through Echols's medical file. (*Id.* at 9.) Weber

---

[4] Numerous times throughout her brief, Echols refers to her medical file as a "secret medical file" or "concealed" medical file. KPS keeps a medical file for any employee who had a medical issue related to work and is required to keep the medical file separate from any other employment file.

said that she noticed the absence of a return to work form, and thought that Echols should update

her medical file.  (*Id.* at 15-16.)

### Subsequent KPS Communications

Echols reads deeply into communications that took place after her meeting with Weber.  On

October 9, 2009, Weber sent a follow-up email to Dr. Shakir-Khan:

> I just met with Charmane,
>
> 1. I showed her what we had in a medical file.  She left with a plan to have that updated.
>
> 2. She claimed to never have been told why she was moved from a principalship several years ago.  I urged her to speak to her union about that as it occurred before my tenure.
>
> 3. From my current perspective, I did speak to her about unclear, fragmented answers during interviews which made her less competitive than other candidates who answered clearly.  I made some suggestions about how she could work on that.  She said she heard full answers in her mind and was glad to know it.  I suggested she do some practice interviewing with someone who would be forthright with her.
>
> 4. Lastly, she expressed that she felt "cut off" by me on two occasions during interviews.  Once was when she appeared to be referring to notes for answers.  I explained that we cannot let a candidate have an advantage using notes.  She said she was not, but understood how it may have looked.  She was not clear on the other time.  I apologized and said that there was no intent to make her uncomfortable.  I thanked her for making we aware.

Dr. Kahn responded:

> Thanks for sharing these notes with me and taking the time to meet with Charmane.  I'm glad that I could refer her to you.  I think this is the best practice so that nothing comes back later with other intentions.  Thanks again.

Weber replied:

> Because these are such CONCRETE areas, I could do it.  With others, I could not, I will not say "People just can't deal with you . . . [] or don't like you . . . [] or won't follow you."  That leads me/you into legal jeopardy.  That is when I cannot critique and offer nothing other than the other candidate was found to be best qualified.

8

On December 3, 2009, Echols wrote a letter to Superintendent Dr. Rice because her job applications "have been tainted by erroneous perceptions of a closed head injury" that she suffered in 1988.  She also felt that KPS's Human Resources department had "concealed" a medical file.

Dr. Rice testified that he discussed Echols's letter with Weber.  Dr. Rice first found out about the closed head injury in the letter that Echols wrote to him and in his subsequent discussion with Weber.  Dr. Rice asked Weber about her impressions of the letter, and Dr. Rice testified that Weber responded by saying:

> [F]rom her vantage point there had been an accident, that it had been a significant accident–my paraphrase of the conversation–and that she thought that it probably had had an adverse impact on her, her opinion.

(Rice Dep. at 10.)  Dr. Rice said that Weber "expressed question about whether there were residual effects" from Echols's accident and injury.  (*Id.* at 11.)  According to Dr. Rice, Weber did not, however, attribute any of Echols's particular actions–for example, speaking with unclear, fragmented answers–to the head injury. (*Id.*)  Weber "expressed question about whether or not there had been adverse impact." (*Id.*)  Dr. Rice asked Weber why she felt there was evidence that Echols had residual effects from the accident; in his opinion, Weber responded "[i]nadequately"–that is, "her response was insufficient from [his] point of view to lead to the conclusion that she drew." (*Id.* at 20.)  Weber does not recall having this conversation with Dr. Rice.  (Weber Dep. at 37-38.)

Besides testifying about what Weber said, Dr. Rice testified that he was unaware of any issue that precluded Echols from doing her job well.  (Rice Dep. at 26.)  He thought that if Weber truly thought something impeded Echols's abilities to perform her job over the past several years, "surely that should have been raised in the last several years." (*Id.*)  Dr. Rice testified that he does not, and never did, perceive Echols as having a disability.

9

LEGAL FRAMEWORK

Summary judgment should be granted when the record reveals that there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. V. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986). "[R]umors, conclusory allegations and subjective beliefs [] are wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992).

Claims of disability discrimination under Michigan law essentially track those under federal law. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 n.3 (6th Cir. 1996) (internal citations omitted). A plaintiff may prove that she was discriminated against based upon her disability either through direct or indirect evidence. *Id.* at 1178. In the Sixth Circuit, the plaintiff must "show that [the plaintiff's] disability was the sole reason" for the adverse employment action. *Hedrick v. W. Reserve Care Syst.*, 355 F.3d 444, 454 (6th Cir. 2004) (emphasis added).

ANALYSIS

I.    **Direct Evidence of Discrimination**

"Direct evidence" of discrimination is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (quotation omitted). Such evidence would take the form, for example, of an employer telling its employee, "I fired you because you are disabled." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998).

Echols relies on three pieces of evidence to show direct evidence of discrimination:

(1)    Dr. Rice's testimony that Weber said she believed Echols may have been suffering from the residual effects of a head injury, and those residual effects may have had an adverse impact on Weber's opinion.

(2)    Echols's testimony regarding what Weber said during their October 9, 2009, meeting; and

10

(3)     The email that Weber sent to Dr. Shakir-Kahn as a follow-up to the October 9, 2009, meeting.

The three pieces of evidence are examples of vague, ambiguous or isolated remarks unrelated to the decision-making process for the adverse employment action at issue, and thus are insufficient to support a finding of direct discrimination.  *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025-26 (6th Cir. 1993); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 380 (6th Cir. 1993) ("[I]solated and ambiguous statements . . . are too abstract, in addition to being irrelevant and prejudicial, to support a finding of . . . discrimination." (citation omitted)).

Every panel member deposed said that Weber, during the panel interviews, did not share her opinions regarding the candidates.  Moreover, there is no evidence that any panel member ever perceived Echols as disabled or suffering effects from a car accident - including Weber, who said that at the time of the interviews she had no idea Echols had even suffered an injury.  Only one panel member, Coles-Chalmers, even knew that Echols had been in a car accident, and not even she thought Echols had any lasting effects from the accident which occurred 20 years earlier.

Second, the hearsay evidence from Dr. Rice and Echols regarding Weber's statements does not show that Weber knew of Echols's accident or injury at the time of conducting the interviews.  Weber said that she viewed Echols's medical folder for the first time on October 9, 2009, subsequent to the interviews.  Echols's hearsay statements regarding Weber could be taken as true, and it still would not controvert Weber's testimony.  The same goes for Dr. Rice's hearsay statements regarding Weber.

Assuming Weber made the comments that Echols alleges, Echols has put forth no evidence to suggest that Dr. Rice would not have made the same final decision.  "Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden . . .of demonstrating animus."  *Bush v. Dictaphone*

11

*Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) (quotations omitted). If an employee's discriminatory animus can be imputed to a decisionmaker, however, then that employee's conduct can show that discriminatory animus caused the adverse employment action. *See Noble v. Brinker Int'l Inc.*, 391 F.3d 715, 723 (6th Cir. 2004) (citations omitted). "[A] plaintiff must submit competent evidence that one employee's 'discriminatory motives somehow influenced' the decisionmaker." *Id.* (citation omitted). In *Noble*, the court did not impute an employee's conduct to the employer. There, the court concluded that the decisionmaker had only minimal contact with the allegedly discriminating employee and that they had not discussed the employee in question, let alone the adverse employment action of that employee. *Id.*

Dr. Rice, who made the final decision for each position, did not know what feedback forms came from which panel members. Moreover, Dr. Rice made the final hiring decision for the positions in question. Further, before making the final decisions, Dr. Rice and Weber did not discuss Weber's opinions of Echols. Also, he did not, and still does not, think that Echols suffered lasting effects from her automobile injury 20 years ago. No evidence suggests that Weber's statements, if she actually made them, somehow influenced Dr. Rice's decision.

In sum, Echols's evidence is insufficient to require the conclusion that discrimination was a motivating factor in KPS's decisions. All of the statements upon which Echols relies as direct evidence are too removed, vague, conclusory, and prejudicial to support an inference of direct discrimination. Moreover, they require the fact-finder to infer that Dr. Rice decided to not hire Echols based solely upon Weber's anonymous feedback form. This inference is speculative, at best.

## II.   **Indirect Evidence of Discrimination**

In the absence of direct evidence of discrimination, courts employ the *McDonnell-Douglas* burden shifting method to analyze claims of disability discrimination. The plaintiff must first establish a prima facie case of discrimination, after which the burden shifts to the defendant to

articulate a legitimate, nondiscriminatory reason for its actions. *Monette*, 90 F.3d at 1185. The plaintiff must then prove that this articulated reason was both false and a pretext for discrimination. *Id.*

### A. Prima Facie Case

"To defeat a properly supported summary judgment motion under the *McDonnell Douglas/Burdine* framework, [the plaintiff] must show that a genuine issue of material fact exists as to each element of his prim[a] facie case." *Burns v. City of Columbus, Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 843 (6th Cir. 1996).[5] "To make out a *prima facie* case of employment discrimination through indirect evidence under Title I, a plaintiff must show that 1) he or she is disabled;[6] 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Id.* (citations and quotations omitted).

### 1. NOT "OTHERWISE QUALIFIED" FOR COORDINATOR OF EARLY CHILDHOOD

Echols cannot establish a prima facie case that she was discriminated against for the Coordinator for Early Childhood position because she was not "otherwise qualified" for the position. To receive an interview for the position, KPS required a Master's Degree in "Early Childhood Education" or "Child Development." Echols has a Master's in "Reading Instruction." Thus, Echols was not "otherwise qualified" because she did not have the requisite Master's Degree that KPS required for the position. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct

---

[5] The parties state a three-element formulation for a prima facie case for employment disability discrimination, but the correct formulation is a five-element formulation used in *Monette*. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (2011) (discussing and deciding that it is more appropriate to use the five-element formulation for employment discrimination cases under the ADA).

[6] Applicable here, this includes "being regarded has having such an impairment." 42 U.S.C. § 12102(C).

1817, 1824 (1973) (stating that the plaintiff must establish, among other things, "he or she applied *and was qualified* for a job for which the employer was seeking applicants" (emphasis added)).

2. <u>NO PANEL MEMBER PERCEIVED ECHOLS TO HAVE A DISABILITY</u>

KPS argues that no KPS employee involved in the interviews perceived Echols as disabled <u>at the time Echols interviewed</u> for each position.  It says that Weber first learned of Echols's medical history when Weber met with Echols on October 9, 2009.   Echols has not introduced evidence to the contrary.

*Burns v. City of Columbus, Dep't of Pub. Safety, Div. of Police,* 91 F.3d 836 (6th Cir. 1996), is instructive on this point.  "[T]he plaintiff must establish, as an element of his or her prima facie case, that the defendant knew or believed that the plaintiff was disabled, or knew of the plaintiff's symptoms that were caused by the disability."  *Id.* 844 (dismissing the case on summary judgment because "[the plaintiff] has not established that the [defendant] *knew or believed* that he was handicapped").

In *Burns*, a seven-member board unanimously decided to recommend that the plaintiff's employment be terminated.  *Id.* at 839.  The plaintiff was ultimately terminated after the decisionmaker approved the recommendation of the board.  The former employee sued seeking redress under the Rehabilitation Act.  In affidavits supporting the defendant's motion for summary judgment, four of the seven board members said that they were unaware that the plaintiff suffered an injury.  *Id.* at 844.  Analyzing the case using the *McDonnell Douglas* framework, the Sixth Circuit affirmed the district court's dismissal on summary judgement.  The court said that the plaintiff could not establish that the defendant knew or believed that he was handicapped because he "failed to present any evidence to contradict the affidavit testimony of the four of the seven Board members who claim to have been unaware of Burns's injury when they made their decision to recommend his termination."  *Id.* at 844.

14

Here, every person deposed who sat on a panel interview testified as to being unaware that Echols suffered from any disability. (Coles-Chalmers Dep. at 4-5; Shakir-Kahn Dep. at 12; Harvey Dep. at 11; Green Dep. at 8-9; Timon Dep. at 5.) This includes Weber. (Weber Dep. at 15.) Moreover, with the exception of Coles-Chalmers who "heard" Echols was in a car accident that involved an injury, the panel members were not even aware that Echols had been in a car accident. (Shakir-Kahn Dep. at 12; Harvey Dep. at 11; Green Dep. at 8-9; Timon Dep. at 5.) Even though Coles-Chalmers heard about the accident, she did not perceive any symptoms of a closed head injury. (Coles-Chalmers Dep. at 4-5.)

Echols's sole argument to rebut this is that "Weber (and as confirmed by Superintendent Dr. Rice) erroneously believed her to have residual effects from the head injury." As explained above, however, Echols has not put forth evidence to establish that Weber regarded Echols as having residual effects *at the time of the interviews*.

Therefore, Echols's claims will be dismissed because she has not created a genuine issue of material fact that any person who interviewed her perceived her to have a disability at the time of the interviews. In addition, as a separate basis for dismissal discussed below, Echols's claims fail because she cannot show that KPS's reasons for not hiring her were pretext for discrimination.

### B.    Legitimate, Nondiscriminatory Reason

KPS has articulated a legitimate, nondiscriminatory reason for not hiring Echols to the positions for which she applied–other candidates performed better in the interviews, and the panel members independently ranked other candidates higher, which Dr. Rice then independently evaluated to make an independent final decision.

### C.    Pretext

"Pretext is a commonsense inquiry." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). A court should not "lose sight of the fact that at bottom the question is always whether

the employer made up its stated reason to conceal intentional discrimination." *Id.* "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Id.* "But summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation." *Id.*

Echols has not carried her burden with respect to the Director of Elementary Education position. Echols, in her own deposition, agreed that Dr. Shakir-Kahn was the most qualified person for that position. (Echols Dep. at 125-26.) Dr. Shakir-Kahn's education and experience is lengthy and impressive. Moreover, Coles-Chalmers said that during this interview Echols's interview answers often seemed rehearsed or memorized, as if she had specific answers to questions that she thought would be asked during the interview. Furthermore, Dr. Terina Harvey, another panel interviewer, chose Dr. Shakir-Khan as her top candidate and said that she looked for candidates who gave the best answers during the interview. Echols has put forth no evidence to call into question KPS's decision to hire Dr. Shakir-Kahn for this position. Finally, as discussed above, Dr. Rice made the final hiring decision and there is no evidence that this decision was influenced by Weber's involvement in the interview process. Dr. Rice's decision cannot be said to have been *solely* based on a disability unbeknownst to him.

With regard to the two principal positions, no jury could reasonably conclude that KPS declined to hire Echols on the *sole* basis of a disability. During the Prairie Ridge principalship interview, Dr. Shakir-Khan recalls Echols's answers to interview questions as "disjointed" and that she "did not give direct responses to the questions asked." She said that she chose Spencer as her top candidate because "[h]er responses to the questions were the most comprehensive." Cindy Green chose Spencer because she gave "in-depth answers for a lot of core areas like reading and math." Moreover, each deposed panel member testified as to having made independent evaluations of each candidate without discussion amongst panel members. Thereafter, Dr. Rice took the

16

feedback forms and independently evaluated the candidates to make the final hiring decisions.  Dr. Rice did not know at the time of making his decisions that Echols had ever suffered a closed head injury 20 years previously.  No evidence suggests that Dr. Rice's determinations were affected by Weber's involvement.  Dr. Rice's decisions cannot be said to have been *solely* based on a disability unbeknownst to him.

CONCLUSION

Echols's complaint will be dismissed because there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law.  KPS's Motion for Summary Judgment will be granted.

A separate order will issue.

Dated:  February 14, 2012                                    _____/s/ Gordon J. Quist_____
                                                                                     GORDON J. QUIST
                                                                                     UNITED STATES DISTRICT JUDGE